

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

January 25, 2023

**BY ECF**

Honorable Kimba M. Wood
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

  Re: *United States v. Rosa Santiago Rodriguez,* No. 19 Cr. 729 (KMW)

Dear Judge Wood:

  The defendant, Rosa Santiago Rodriguez, is scheduled to be sentenced on February 22, 2023, at 2:00 p.m. The Government makes this submission in advance of sentencing. The applicable United States Sentencing Guidelines ("Guidelines") range is 70 to 87 months' imprisonment. For the reasons set forth below, the Government submits that a sentence within the Guidelines range is appropriate in this case.

  **I. <u>Offense Conduct</u>**

  Starting in May 2019, the Drug Enforcement Administration was investigating a drug trafficking organization ("DTO") that was sending narcotics, primarily in the mail, from various locations in the U.S. to the Northeast, including Airbnb rentals in the New York metropolitan area. (PSR ¶ 10). The DEA made multiple seizures of kilo-quantities of fentanyl and heroin in New York, Rhode Island, and New Jersey as part of the investigation, showing the DTO had a deep network of conspirators participating in the conspiracy to distribute large quantities of narcotics. (*Id.*). In June 2019, law enforcement seized a packaged mailed to an apartment in New Jersey that contained four kilograms of fentanyl. (PSR ¶ 11). Law enforcement obtained the Internet Protocol (IP) addresses that had been used to track the shipping status of the package with the U.S. Postal Service. (*Id.*). One of these IP addresses was subscribed to the defendant and her residence in Washington Heights in Manhattan ("Apartment-1"). (PSR ¶¶ 10-11). Based on the information, law enforcement identified the defendant's residence as a location potentially used by the DTO in its drug trafficking activities, and law enforcement visited the defendant at her residence. (*Id.*).

  On September 10, 2019, at about 6:30 a.m., law enforcement knocked on the door of Apartment-1, the defendant's residence. (PSR ¶ 12). Law enforcement waited outside of Apartment-1 until the defendant and her minor son exited Apartment-1 at 8:00 a.m. (*Id.*). The law enforcement agents identified themselves as law enforcement and asked to speak with the

1

defendant; she agreed they could speak in Apartment-1, where she said she had lived alone with her son for the past six years. (*Id.*).

While in Apartment-1, the agents noticed in plain view a money counter, several bags of rubber bands, and a small bag containing what appeared to be marijuana. (PSR ¶ 13). In response to questioning, the defendant denied that she had large amounts of cash or anything illegal in her apartment. (*Id.*). To communicate more easily, the case agents put a Spanish-speaking agent on the speaker phone to communicate with and translate for the defendant. (PSR ¶ 14). With the assistance of the Spanish-speaking agent, the defendant consented to a search of her residence, *i.e.*, Apartment-1, and signed a written, Spanish consent to search form. (*Id.*).

During the search, the agents recovered fentanyl, bulk cash, ammunition, and narcotics paraphernalia. (PSR ¶ 15). Specifically, the agents found a vacuum-sealed brick of narcotics in the kitchen cupboard; initially, the narcotics field tested positive as cocaine, but later lab analysis showed the narcotics were fentanyl. (*Id.*). The agents found $100,000 in cash bundled in rubber bands in an open shopping bag on top of the bed in the child's bedroom, and approximately $20,000 in cash bundled in rubber bands in a purse in a closet. (*Id.*). Agents further recovered a box of bullets in a kitchen cabinet. (*Id.*). The agents also found various narcotics paraphernalia in the kitchen, including a money counter, a small scale, several hundred small Ziplock bags, a mask, and a bag full of rubber bands. (*Id.*). Moreover, agents found in the kitchen a notebook that listed various large sums of money in the tens and hundreds of thousands of dollars and various people's names, consistent with a ledger used to track payments and amounts owed for narcotics. (*Id.*). In response to questions during the search, the defendant stated that the cash recovered in Apartment-1 belonged to other unidentified people and that she knew the brick-like package in the kitchen contained narcotics. (PSR ¶ 16). After the agents completed the search, they arrested the defendant.

On September 10, 2019, the same day as her arrest, the defendant was charged by complaint with conspiracy to distribute narcotics, presented before the Honorable James L. Cott, and released on bail, which included a $100,000 personal recognizance bond to be co-signed by two financially responsible people, surrender of all travel documents, travel limited to the Southern and Eastern Districts of New York, and pretrial supervision as directed. (ECF No. 4). The Government in part consented to these bail conditions in recognition that the defendant had no criminal history and was a single mother and sole caregiver for her young son. Within less than one week of receiving bail, however, before the defendant proposed co-signers for the bond, the defendant absconded from pretrial supervision and fled to the Dominican Republic. (PSR ¶¶ 7, 18, 49).[1]

## II. Procedural History

After the defendant became a fugitive, on October 9, 2019, a grand jury in this district returned an indictment charging the defendant with conspiracy to distribute narcotics. On November 6, 2019, a grand jury returned a superseding indictment, charging the defendant with

---

[1] The defendant described in her submission that her brother "was also charged in the drug case." Def. Submission at 15. The Government clarifies that the defendant's brother was not charged as part of this investigation. The Government's understanding is that the defendant was previously charged in an unrelated narcotics case and absconded to the Dominican Republic.

one count of bail jumping, in violation of 18 U.S.C. § 3146(a)(1) and (b)(1)(A)(i), in addition to the previously charged narcotics conspiracy, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(B). Ultimately, the Government learned that the defendant was in the Dominican Republic and sought the defendant's arrest and extradition. On July 1, 2021, almost two years after her initial arrest in New York, the defendant was arrested in the Dominican Republic, and she was extradited to New York on October 7, 2021.

On May 27, 2022, the defendant pled guilty to both counts of the superseding indictment. The Government's *Pimentel* letter dated February 15, 2022, provided that the applicable Guidelines Range is 70 to 87 months' imprisonment and that the defendant appears to satisfy the conditions set forth in Title 18, United States Code, Section 3553(f) for relief from the statutory minimum sentence provision requiring 60 months' imprisonment. Prior to her guilty plea, the defendant had provided a fulsome safety-valve proffer. In its final Presentence Report, Probation calculated the defendant's Guidelines range to be 70 to 87 months' imprisonment. Probation recommends a sentence of 36 months' imprisonment. (PSR at 17).

### III.   A Guidelines Sentence is Appropriate in This Case

#### A. Applicable Law

Although *United States v. Booker* held that the Guidelines are no longer mandatory, it also held that they remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. 543 U.S. 220, 264 (2005). As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).

After that calculation, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available;" (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants;" and (7) "the need to provide restitution to any victims." 18 U.S.C. § 3553(a)(1)-(7); *see also Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B)   to afford adequate deterrence to criminal conduct;
> (C)   to protect the public from further crimes of the defendant; and
> (D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

3

B.  **Discussion**

In this case, the Government believes a substantial sentence consistent with the Guidelines range would achieve the goals of sentencing and appropriately balance the factors considered pursuant to Section 3553(a).

*First*, such a sentence is necessary to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment. *See* 18 U.S.C. § 3553(a)(2)(A). The seriousness of the defendant's offense is indisputable. The defendant participated in a DTO that was distributing kilogram quantities of fentanyl and heroin in the Northeast, including in the New York metropolitan area, by shipping narcotics in the mail to Airbnb rentals. Her participation in the DTO's activities was significant. The defendant was involved in tracking and distributing the narcotics. She checked the delivery status of mail packages containing narcotics using her home internet, and she stored a significant quantity of narcotics in her home, as demonstrated by the kilogram of fentanyl found in her kitchen. In addition, the depth of the defendant's involvement in the narcotics conspiracy is demonstrated by the defendant's involvement in collecting and transferring significant bulk cash payments for the narcotics. Over $100,000 in cash was found in the defendant's apartment, which the defendant admitted belonged to other people, and the ledger in the defendant's pink notebook indicates that the defendant facilitated payments of hundreds of thousands of dollars in drug proceeds.

Although the Probation Office in the Presentence Report described the defendant's conduct as "non-violent", the defendant's participation in distributing fentanyl presented a clear danger to the community with potentially deadly consequences. *See United States v. Leon*, 766 F.2d 77, 81 (2d Cir. 1985) ("[I]t is clear that the harm to society caused by narcotics trafficking is encompassed within Congress' definition of 'danger.'"). The distribution of fentanyl—an extremely potent and dangerous synthetic opioid—is an offense whose severity "cannot be understated." *United States v. Colon*, No. 09-CR-294, 2021 WL 389144, at *6 (D. Conn. Feb. 4, 2021) (in a case involving the distribution of fentanyl, noting that the "seriousness of the offense cannot be understated"); *see also United States v. Pena*, No. 18-CR-858 (SHS), 2021 WL 2358803, at *2 (S.D.N.Y. June 9, 2021) ("The 'nature and circumstances of the offense' are serious. Pena was arrested attempting to sell large quantities of heroin and fentanyl, two of the most dangerous and deadly drugs infiltrating American communities."). Here, the defendant possessed approximately an entire kilogram of fentanyl, which "has the potential to kill 500,000 people." U.S. Drug Enforcement Administration, *Facts about Fentanyl*, https://www.dea.gov/resources/facts-about-fentanyl (last visited January 25, 2023). Moreover, drug overdose deaths in New York City have soared due to the increased availability of fentanyl. As reported in a recent New York Times article, "there were 2,668 fatal overdoses in the city in 2021 . . . , [which] was an increase of more than 500 over the 2020 figure, which itself was 600 deaths above the total in 2019." The New York Times, *Fentanyl Helps Push Overdoes Deaths to Record Level in New York City* (Jan. 13, 2023).

In addition, the defendant's bail jumping is a serious offense. The defendant's conduct demonstrates a blatant disrespect for the law. The Court placed great trust in the defendant by releasing her on bail the same day as her arrest on her own signature with the surrender of her passport. The fact that the defendant was a single mother of a young son was an important factor in favor of the defendant's immediate release on bail. The defendant, however, took advantage of

4

the Court's trust to flee immediately. Even though the defendant had surrendered her passport, the defendant managed to flee to the Dominican Republic, where she resided for almost two years before she was again arrested in this case. In addition, given the defendant's significant participation in the drug operation, a substantial sentence is necessary to provide sufficient specific deterrence.

*Second*, a substantial sentence is necessary to afford adequate deterrence. *See* 18 U.S.C. § 3553(a)(2)(B). As described above, the opioid epidemic is ravaging communities across the country. It is necessary to deter individuals such as the defendant who are willing to engage in such dangerous conduct that fuels the epidemic for their own financial gain. A Guidelines sentence is therefore warranted to impress upon the public that conduct such as the defendant's will be subject to serious consequences. Moreover, a substantial sentence is necessary to deter other defendants who may consider becoming fugitives. The federal bail system places great trust in defendants to appear in court to face criminal charges. Accordingly, the Court should impose a serious sentence to signal to other defendants that they will face grave consequences if they flee from prosecution.

The Government acknowledges that there are mitigating factors in this case that the Court should consider, as highlighted by the defendant, but the Court should take those mitigating factors in context. [redacted] Moreover, regarding conditions at the MDC generally, the Second Circuit recently held that there is "no authority suggesting that a district court imposing a sentence is obligated to assign even this much weight [i.e., a sentence as the low end of the applicable Guidelines range], let alone more, to the harsh prison conditions brought on by the pandemic," *United States v. Edwards*, No. 21-1248, 2022 WL 1553455, at *2 (2d Cir. May 17, 2022).

Lastly, the defendant cites the defendant's "familial responsibilities," *i.e.* that she is a single mother with a young son, as an argument in favor of a lenient sentence. The Government is sympathetic to the defendant's family circumstances, and while it is no doubt true that the defendant's son is impacted by the defendant's incarceration, that is sadly the case for nearly all families with incarcerated loved ones. Perhaps for this reason, the Second Circuit has held that a defendant's "family ties . . . generally only justify a downward departure in 'unusual' or 'extraordinary' cases[.]" *United States v. Lyttle*, 460 F. App'x 3, 10 (2d Cir. 2012); *see also* U.S.S.G. § 5H1.6 ("In sentencing a defendant . . . family ties and responsibilities are not ordinarily

---

[2] The Government is providing the Court with the defendant's medical records under seal as Exhibit A. The Government previously provided a copy of the defendant's medical records to defense counsel.

relevant in determining whether a departure may be warranted."). Furthermore, these unfortunate consequences of criminal conduct were entirely foreseeable to the defendant; no one else but the defendant made the choices that resulted in her being separated from her son. *See United States v. Al Kassar*, No. 07 Cr. 354 (JSR), 2020 WL 4813199, at *2 (S.D.N.Y. Aug. 19, 2020) ("[W]hile the Court is cognizant of the burden imposed by defendant's inability to see his loving family, anyone who commits as serious a crime as this defendant must know in his heart that if he is caught and imprisoned, it is his own family who may suffer the worst."). Thus, with her young son depending on her, the defendant already had every incentive to refrain from committing the instant offenses, signaling a need for deterrence and respect for the law. The defendant chose to engage in drug trafficking despite having other employment. By committing the instant offenses, she recklessly risked leaving her young son who depends on her in the event she was arrested and prosecuted, and she exposed her son to the dangers of fentanyl by keep narcotics in an accessible location in her home.

### C. Conclusion

For the reasons set forth above, the Government respectfully submits that a sentence within the Guidelines range of 70 - 87 months' imprisonment would be fair and appropriate in this case.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

By: *Cecilia Vogel*
Cecilia Vogel
Assistant United States Attorney
(212) 637-1084

cc:   Jeffrey Pittell, Esq. (by ECF)